Filed 1/2/2018 10:25 AM
Karen L. Wilson
District Clerk
Van Zandt County, Texas

Stormy Canady

Van Zandt County - District Clerk

CAUSE NO. _17-00302_____

| | | |
|---|---|---|
| **COUNTY OF VAN ZANDT,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | _294___ **JUDICIAL DISTRICT** |
| | § | |
| **PURDUE PHARMA, L.P.;** | § | |
| **PURDUE PHARMA, INC.;** | § | |
| **THE PURDUE FREDERICK COMPANY;** | § | |
| **JOHNSON & JOHNSON;** | § | **VAN ZANDT COUNTY, TEXAS** |
| **JANSSEN PHARMACEUTICALS, INC.;** | § | |
| **ORTHO-MCNEIL-JANSSEN** | § | |
| **PHARMACEUTICALS, INC.** n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| **JANSSEN PHARMACEUTICA, INC.** n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| **ENDO HEALTH SOLUTIONS INC.;** | § | |
| **ENDO PHARMACEUTICALS, INC.;** | § | |
| **ABBVIE INC.;** | § | |
| **KNOLL PHARMACEUTICAL** | § | |
| **COMPANY,** a wholly-owned subsidiary of | § | |
| ABBVIE INC.; | § | |
| **ALLERGAN PLC** f/k/a ACTAVIS PLC; | § | |
| **ALLERGAN FINANCE LLC** f/k/a | § | |
| ACTAVIS, INC. f/k/a WATSON | § | |
| PHARMACEUTICALS, INC.; | § | |
| **WATSON LABORATORIES, INC.;** | § | |
| **ACTAVIS LLC;** | § | |
| **ACTAVIS PHARMA, INC.** f/k/a WATSON | § | |
| PHARMA, INC.; | § | |
| **MCKESSON CORPORATION;** | § | |
| **CARDINAL HEALTH, INC.;** | § | |
| **AMERISOURCEBERGEN** | § | |
| **CORPORATION;** and | § | |
| **DOES 1 – 100, INCLUSIVE,** | § | |
| | § | |
| *Defendants.* | § | |

PLAINTIFF'S ORIGINAL PETITION

I certify this to be a true and exact copy of the original on file in the District Clerk's Office Van Zandt County, Texas
By: _____
DEPUTY CLERK

1

## PLAINTIFF'S ORIGINAL PETITION AND JURY DEMAND

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff, the County of Van Zandt, Texas, by and through the undersigned attorneys, (hereinafter "Van Zandt County" or "County"), on behalf of the District Attorney for Van Zandt County, against Defendants Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Johnson & Johnson, Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Abbvie Inc., Knoll Pharmaceutical Company, a wholly-owned subsidiary of Abbvie Inc., Allergan PLC f/k/a Actavis PLC, Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, and Does 1 – 100, alleges as follows:

## I.    INTRODUCTION

1.     The United States is in the midst of an opioid epidemic caused by Defendants' fraudulent marketing and sales of prescription opioids ("opioids") that has resulted in addiction, criminal activity, and loss of life. The opioid crisis has been described as "the AIDS epidemic of our generation, but even worse."[1] On October 26, 2017, President Donald Trump "declared a nationwide public health emergency to combat the opioid crisis."[2]

2.     In 2016 alone, health care providers wrote more than 289 million prescriptions for

---

[1] David Wright, "Christie on Opioids: "This is the AIDS Epidemic of Our Generation, but even Worse," (Oct. 27, 2017), http://www.cnn.com/2017/10/27/politics/chris-christie-opioid-commission-aids-cnntv/index.html.
[2] Dan Merica, "What Trump's Opioid Announcement Means – and Doesn't Mean," (Oct. 26, 2017), http://www.cnn.com/2017/10/26/politics/national-health-emergency-national-disaster/index.html.

opioids, enough for *every adult in the United States* to have more than one bottle of pills.[3] Americans "consume 85% of all the opioids in the world" and are "the most medicated country in the world . . . ."[4]

3.        Unfortunately, using opioids too often leads to addiction and overdose from opioids. In 2014, almost 2 million Americans were addicted to opioids.[5] That same year, more people died from drug overdoses than in any other year, and most overdose deaths involved an opioid. The Texas Legislature has found "that deaths resulting from the use of opioids and other controlled substances constitute a public health crisis."[6] In 2015, Texas "had the second highest total healthcare costs from opioid abuse in the nation ($1.96 billion) . . . ."[7]

4.        In fact, accidental drug overdose deaths, of which reportedly at least two-thirds are opioid overdoses, are the leading cause of death for Americans under the age of 50. Accidental drug overdose deaths, predominantly from opioids, exceed the number of deaths caused by cars or guns.

5.        The economic burden caused by opioid abuse in the United States is at least $78.5 billion,[8] including lost productivity and increased social services, health insurance costs, increased criminal justice presence and strain on judicial resources, and substance abuse treatment and rehabilitation.

6.        This epidemic did not occur by chance. Defendants manufacture, market, distribute,

---

[3] *Prevalence of Opioid Misuse*, BupPractice (Sept. 7, 2017), https://www.buppractice.com/node/15576.
[4] David Wright, "Christie on Opioids: "This is the AIDS Epidemic of Our Generation, but even Worse," (Oct. 27, 2017), http://www.cnn.com/2017/10/27/politics/chris-christie-opioid-commission-aids-cnntv/index.html.
[5] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health, 2014.
[6] Opinion of the Attorney General of Texas, KP-0168 (Oct. 4, 2017), *citing* Act of May 26, 2017, 85th Leg., R.S., ch. 534, §3, 2017 Tex. Sess. Law Serv. 1467, 1468.
[7] Kerry Craig, "Opioid Addiction Results in one Woman's Daily Struggle," Oct. 7, 2017, https://www.ssnewstelegram.com/news/opioid-addiction-results-in-one-woman-s-daily-struggle/article_bded4eoa-ab80-11e7-a252-d3f304e26628.html.
[8] *See CDC Foundation's New Business Pulse Focuses on Opioid Overdose Epidemic*, Centers for Disease Control and Prevention (Mar. 15, 2017), https://www.cdc.gov/media/releases/2017/a0315-business-pulse-opioids.html.

CERTIFIED COPY

and sell prescription opioids, including, but not limited to, brand-name drugs like OxyContin, Vicodin, Opana, Percocet, Percodan, Duragesic, Ultram, Ultracet, and generics like oxycodone, oxymorphone, hydromorphone, hydrocodone, fentanyl, and tramadol, which are powerful narcotics.

7.      Historically, opioids were considered too addictive and debilitating for treating non-cancer chronic pain,[9] such as back pain, migraines, and arthritis, and were used only to treat short-term acute pain or for palliative or end-of-life care.

8.      By the late 1990s or early 2000s, however, each Manufacturing Defendant began a marketing scheme to persuade doctors and patients that opioids can and should be used ubiquitously and perpetually to treat moderate, non-cancer chronic pain. Each Manufacturing Defendant spent large sums of money to promote the benefits of opioids for non-cancer moderate pain while trivializing, or even denying, their risks. The Manufacturing Defendants' promotional messages deviated substantially from any approved labeling of the drugs and caused prescribing physicians and consuming patients to underappreciate the health risks, and to overestimate the benefits, of opioids.

9.      Contrary to the language of their drugs' labels, Defendants falsely and misleadingly, in their marketing: (1) downplayed the serious risk of addiction; (2) promoted and exaggerated the concept of "pseudoaddiction" thereby advocating that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction.

---

[9] "Chronic pain" means non-cancer pain lasting three months or longer.


CERTIFIED COPY

10.     Defendants disseminated these falsehoods through ads and/or their sales representatives and physicians who supported Defendants' message. Sales representatives, working at Defendants' behest, promoted highly addictive opioids through souvenirs and toys including, but not limited to, opioid brand-bearing stuffed plush toys, dolls, coffee cups, fanny packs, water bottles, notepads, pens, refrigerator magnets, clocks, letter openers, rulers, daytime planners, bags, puzzles, posters, hand-held calculators, clipboards, highlighters, flashlights, key chains, clothing, reflex mallets, and mock-ups of the United States Constitution.

11.     Defendants also used third parties they controlled by:  (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

12.     Defendants worked with KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific articles. After their individual and concerted efforts, Defendants convinced doctors that instead of being addictive and unsafe for long-term use in most circumstances, opioids were *required* in the compassionate treatment of chronic pain.

13.     The Distributor Defendants were not standing by idly while Marketing Defendants were peddling their opioids to physicians and consumers. Cardinal, AmerisourceBergen, and McKesson ("Distributor Defendants") are three of the largest opioid distributors in the United States. Distributor Defendants purchased opioids from Manufacturing Defendants herein and sold them to pharmacies servicing consumers in Van Zandt County.

14.     Despite the alarming and suspicious rise in the ordering of opioids by retailers in

Van Zandt County, Distributor Defendants did nothing. The Manufacturing Defendants and Distributor Defendants worked hand and glove to glut the U.S. and Van Zandt County with more opioids than would be consumed for therapeutic purposes. Each Defendant disregarded its legal duty to report suspicious opioid prescriptions, and each Defendant financially benefitted from the other Defendants (both Manufacturing and Distributor Defendants), disregarding their individual duties to report.

15.     Essentially each Defendant ignored science and consumer health for profits. Defendants' efforts were so successful that opioids are now the _most_ prescribed class of drugs generating $11 billion in revenue for drug companies in 2014 alone. Even after Purdue reached a $600 million federal settlement in 2007, the settlement failed to impact what is a "$13-billion-a-year opioid industry."[10]

16.     As a direct and foreseeable consequence of Defendants' misrepresentations regarding the safety and efficacy of using opioids for chronic pain, Van Zandt County has spent, and continues to spend, large sums combatting the public health crisis created by Defendants' negligent and fraudulent marketing campaigns.

17.     For example, thousands of prescriptions were written for opioids in Van Zandt County in 2012[11] and in 2014 there were multiple deaths reported from drug overdoses.[12]  A substantial number of those overdose deaths were a result, in whole or in part, of opioid ingestion. Upon information and belief, in each year from 2013-2017, there were multiple deaths in Van Zandt County caused in whole or in part from ingestion of prescription opioids. Defendants'

---

[10] Rebecca L. Haffajee, J.D., Ph.D., M.P.H., and Michelle M. Mello, J.D., Ph.D., _Drug Companies' Liability for the Opioid Epidemic_, N. Engl. J. Med. at 2305, (Dec. 14, 2017).
[11] https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html; https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality.
[12] https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality.

marketing misconduct, as well as Defendants' efforts to sell more prescription opioids that can be consumed therapeutically, were natural and foreseeable causes of overdose deaths and injuries in Van Zandt County.

18.     As a direct and foreseeable consequence of Defendants' conduct described regarding prescription opioids, Van Zandt County has committed and continues to commit resources to provide and pay for health care, law enforcement, social services, public assistance, pharmaceutical care and other services necessary for its residents.

## II.     RULE 47 STATEMENT OF MONETARY RELIEF SOUGHT

19.     Per Rule 47 of the Texas Rules of Civil Procedure, the County states that although the full measure of its damages is still being calculated, its damages caused by Defendants' acts and omissions exceed $1,000,000 but are believed to be less than $50,000,000. Accordingly, at this time in the litigation, Van Zandt County states that it is seeking monetary relief for an amount greater than $1,000,000 and less than $50,000,000, the rightful and just amount to be determined by the jury.

## III.     VENUE AND JURISDICTION

20.     Venue is proper in Van Zandt County because all or a substantial part of the events or omissions giving rise to this claim occurred in Van Zandt County.   TEX. CIV. PRAC. & REM. CODE §15.002(a)(2).  This Court has subject-matter jurisdiction over this matter because Plaintiff's damages are in excess of the minimal jurisdictional limits of this Court.   TEX. GOVT. CODE §24.007(b).

21.     This Court has specific jurisdiction over all Defendants as their activities were directed toward Texas, and injuries complained of herein resulted from their activities. *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991). Each Defendant has a substantial connection with Texas and the requisite minimum contacts with Texas necessary to constitutionally permit the Court to exercise  jurisdiction. *See id.* at 226.

## IV.   PARTIES

### A.   Plaintiff

22.     This action is brought for and on behalf of Van Zandt County, which provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

### B.   Defendants

23.     PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware, and may be served through its registered agent for service of process, The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808.  PURDUE PHARMA L.P. is, through its ownership structure, a Texas resident. PURDUE PHARMA, INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and may be served through its registered agent for service of process, Corporation Service Company, 80 State Street, Albany, NY 12207. THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut, and may be served through its registered agent for service of process, The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808 (collectively, "Purdue").

24.     Purdue manufactures, promotes, sells, and distributes opioids in the U.S. and Van Zandt County. Purdue's opioid drug, OxyContin, is among the most addictive and abused prescription drugs in the history of America. Purdue promotes opioids throughout the United States and in Van Zandt County.

25.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX

75201. JANSSEN PHARMACEUTICALS, INC. is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey, and may be served through its registered agent for service of process, Attention: Legal Department, One Johnson & Johnson Plaza, New Brunswick, NJ 08933.  ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.  J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's  products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to as "Janssen").

26.     Janssen manufactures, promotes, sells, and distributes opioids in the U.S. and in Van Zandt County.

27.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.  ENDO PHARMACEUTICALS, INC. is a wholly- owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201. (Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. are referred to as "Endo").

28.     Endo develops, markets, and sells opioid drugs in the U.S. and in Van Zandt County. Endo also manufactures and sells generic opioids in the U.S. and Van Zandt County, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

29.     ABBVIE INC. ("Abbvie") is a Delaware corporation with its principal place of business in North Chicago, Illinois, and may be served through its registered agent for service of process, CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604. KNOLL PHARMACEUTICAL COMPANY ("Knoll") has been a wholly-owned subsidiary of Abbvie from January 1, 2013. KNOLL PHARMACEUTICAL COMPANY is a New Jersey corporation with its principal place of business in Parsippany, New Jersey, and may be served through its registered agent for service of process, CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, IL 60604.

30.     Knoll irresponsibly marketed narcotics, such as Vicodin, through whimsical toys and souvenirs and did so to boost the sales of opioids. Taking advantage of the fact that Vicodin was not regulated as a Schedule II controlled substance for many years, and the fact physicians and consumers did not fully appreciate the highly addictive nature of Vicodin, Knoll advertised Vicodin with tag lines such as "The Highest Potency Pain Relief You Can Still Phone In." This tag line came as part and parcel of souvenirs like a "Vicodin" fanny pack and water bottle, both bearing the name of Vicodin, the opioid Knoll was promoting. This irresponsible marketing of a narcotic drug caused doctors and patients to believe Vicodin was safer than it really was, to the detriment of people in Van Zandt County.

31.     Abbvie began manufacturing, developing, promoting, marketing, and selling the opioid drug, Vicodin, in the U.S. and in Van Zandt County beginning January 1, 2013. On information and belief, it continues to do so at the time of filing this pleading.

32.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in January 2013.  Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to ALLERGAN FINANCE, LLC as of October 2013. ALLERGAN FINANCE, LLC is a Nevada Corporation with its principal place of business in Parsippany, New Jersey, and may be served through its registered agent for service of process, The Corporation Trust Company of Nevada, 701 S. Carson St., Suite 200, Carson City, NV 89701. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan plc (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.), and may be served through its registered agent for service of process, Corporate Creations Network, Inc., 8275 South Eastern Ave., #200, Las Vegas, NV 89123.  ACTAVIS PHARMA, INC. (f/k/a  Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as WATSON PHARMA, INC, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.  ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey, and may be served through its registered agent for service of process, Corporate Creations Network, Inc., 3411 Silverside Rd., Tatnall Building, Suite 104, Wilmington, DE 19810. Each of these Defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States.

33.     Upon information and belief, Allergan plc exercises control over these marketing and  sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit.  (Allergan plc, Actavis plc, Actavis, Inc., Allergan Finance, LLC, Actavis LLC, Actavis

Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis"). Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

34. Actavis manufactures, promotes, sells, and distributes opioids in the U.S. and in Van Zandt County.

35. MCKESSON CORPORATION ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California, and may be served through its registered agent for service of process, CSC - Lawyers Incorporating Service, 211 E. 7th Street, Suite 620, Austin, TX 78701. Upon information and belief, McKesson is a pharmaceutical distributor licensed to do business in Texas. McKesson distributes pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Texas and Van Zandt County.

36. CARDINAL HEALTH, INC. ("Cardinal") is an Ohio Corporation with its principal place of business in Dublin, Ohio, and may be served through its registered agent for service of process, CT Corporation System, 4400 Easton Commons, Suite 125, Columbus, OH 43219. Cardinal does substantial business in Texas and, upon information and belief, Cardinal is a pharmaceutical distributor licensed to do business in Texas. Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas and Van Zandt County.

37. AMERISOURCEBERGEN DRUG CORPORATION ("Amerisource") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania, and may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. Amerisource does substantial business in Texas and, upon information and belief, Amerisource is a pharmaceutical distributor



licensed to do business in Texas. Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas and Van Zandt County.

38.     The County lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate or otherwise, of Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. The County will amend this Petition to show their true names and capacities if and when they are ascertained. Van Zandt County is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE has engaged in conduct that contributed to cause events and occurrences alleged in this Petition and, as such, shares liability for at least some part of the relief sought herein.

## V.     FACTUAL ALLEGATIONS

39.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for short-term acute pain – pain relating to recovery from surgery or for cancer or palliative (end-of-life) care. Using opioids for chronic pain was discouraged or even prohibited because there was a lack of evidence that opioids improved patients' ability to overcome pain and function. Instead the evidence demonstrated that patients developed tolerance to opioids over time, which increased the risk of addiction and other side effects.

40.     Defendants dramatically changed doctors' views regarding opioids through a well-funded deceptive marketing scheme. Each Defendant used direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use.

## A.     Defendants Used Multiple Avenues To Disseminate their False and Deceptive Statements about Opioids.

41.     Defendants spread their false and deceptive statements by (1) marketing their branded opioids directly to doctors treating patients residing in Van Zandt County and the Van

PLAINTIFF'S ORIGINAL PETITION

Zandt County patients themselves and (2) deploying so-called unbiased and independent third parties to Van Zandt County.

**1. Defendants Spread and Continue to Spread Their False and Deceptive Statements Through Direct Marketing of Their Branded Opioids.**

42.     Defendants' direct marketing of opioids generally proceeded on two tracks.  First, each Defendant conducted advertising campaigns touting the purported benefits of their branded drugs. For example, Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001, including $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

43.     A number of Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain.  For example, Endo distributed and made available on its website, www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like a construction worker and chef, implying that the drug would provide long-term pain-relief and functional improvement.  Purdue also ran a series of ads, called "pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Pursuant to a settlement agreement, Endo and Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but they may continue to disseminate them in Texas.

44.     Second, each Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. Defendants devoted massive resources to direct sales contacts with doctors. In 2014 alone, Defendants spent $168 million on detailing branded opioids

to doctors, including $108 million by Purdue, $34 million by Janssen, $10 million by Endo, and $2 million by Actavis. This amount is twice as much as Defendants spent on detailing in 2000.

45.     Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Defendants.  These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers.  These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by Defendants.  On information and belief, these presentations conveyed misleading information, omitted material information,  and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

46.     Defendants employed the same marketing plans, strategies, and messages in and around Van Zandt County, Texas as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels and in each sales territory. Defendants consider this high level of coordination and uniformity  crucial to successfully marketing their drugs.

### 2. Defendants Used a Diverse Group of Seemingly Independent Third Parties to Spread False and Deceptive Statements about the Risks and Benefits of Opioids.

47.     Defendants also deceptively marketed opioids in and around Van Zandt County through unbranded advertising – *i.e.*, advertising that promotes opioid use generally but does not name a specific opioid.  This advertising was ostensibly created and disseminated by independent third parties.  But by funding, directing, reviewing, editing, and distributing this unbranded

advertising, Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for treating chronic pain.

48.     Unbranded advertising also avoided regulatory scrutiny because Defendants did not have to submit it to the FDA, and therefore it was not reviewed by the FDA.

49.     Defendants' deceptive unbranded marketing often contradicted their branded materials reviewed by the FDA.  For example, Endo's unbranded advertising contradicted its concurrent, branded advertising for Opana ER:

| Pain: Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted**." | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

a.     **Key Opinion Leaders (KOLs)**

50.     Defendants spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Defendants because their public positions supported using opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

51.     Defendants paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, and their support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Defendants by advancing their marketing goals.  KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Defendants.

52.     KOLs have written, consulted on, edited, and lent their names to books and articles,



and given speeches and CMEs supportive of chronic opioid therapy. Defendants created opportunities for KOLs to participate in research studies Defendants suggested or chose and then cited and promoted favorable studies or articles by their KOLs.  By contrast, Defendants did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

53.     Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage using opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to direct and exert control over each of these activities through their KOLs.

54.     Pro-opioid doctors are one of the most important avenues that Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

55.     Defendants utilized many KOLs, including many of the same ones. Two of the most prominent are described below.

### 1. Russell Portenoy

56.     Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL who Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Endo, Janssen, and Purdue (among others), and was a paid consultant to Purdue.

57.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS")/American Academy of  Pain

CERTIFIED COPY

Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009.  He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by Defendants.

58.     Dr. Portenoy also made frequent media appearances promoting opioids. He appeared on *Good Morning America* in 2010 to discuss using opioids long-term to treat chronic pain.  On this widely-watched program, broadcast in Texas and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[13]

59.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[14]  These lectures falsely claimed that less than 1% of patients would become addicted to opioids. According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated their benefits and glossed over their risks.  Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[15]  Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well…I guess I did."[16]

### 2.  Lynn Webster

60.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah.  Dr.

---

[13] Good Morning America television broadcast, ABC News (Aug. 30, 2010).
[14] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., Dec. 17, 2012.
[15] *Id.*
[16] *Id.*



Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy.  He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER.  Dr. Webster authored numerous CMEs sponsored by Endo and Purdue while he was receiving significant funding from Defendants.

61.     In 2011, Dr. Webster presented a program via webinar sponsored by Purdue titled, *Managing Patient's Opioid Use:  Balancing the Need and the Risk*.  Dr. Webster recommended using risk screening tools, such as urine testing and patient agreements as a way to   prevent "overuse of prescriptions" and "overdose deaths," which was available to and was intended to reach doctors treating Van Zandt County residents.

62.     Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids.  As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), a book that is still available online, when faced with  signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."  Endo distributed this book to doctors.  Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients  more medication."[17]

**b.     Front Groups**

63.     Defendants entered into arrangements with seemingly unbiased and  independent patient and professional organizations to promote opioids for treating  chronic pain. Under Defendants' direction and control, these "Front Groups" generated treatment guidelines, unbranded

---

[17] John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, MILWAUKEE WISC. J. SENTINEL  (Feb. 19, 2012).

materials, and programs that favored chronic opioid therapy.  They also assisted Defendants by responding to negative articles, by advocating against regulatory changes that would limit prescribing opioids in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by Defendants.

64.    These Front Groups depended on Defendants for funding and, in some cases, for survival. Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, Defendants made sure these Groups would generate only the messages Defendants wanted to distribute. Even so, the Front Groups held themselves out as independent and as serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

65.    Defendants Endo, Janssen, and Purdue utilized many Front Groups, including many of the same ones.  Several of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

### 1.    American Pain Foundation ("APF")

66.    The most prominent of Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next at $1.7 million.

67.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources.  Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total

income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained the lack of funding diversity was one of the biggest problems at APF.

68.     APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also engaged in a significant multimedia campaign – through radio, television, and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach patients and consumers in Van Zandt County.

### 2. American Academy of Pain Medicine ("AAPM")

69.     The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted medical education programs essential to Defendants' deceptive marketing of chronic opioid therapy.

70.     AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event – its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Actavis were members of the council and presented deceptive programs to doctors who attended

this annual event.

71.     AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized  sessions on opioids – 37 out of roughly 40 at one conference alone.  AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster.  Dr. Webster was even elected president of AAPM while under a DEA investigation.  Another past  AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[18]

72.     AAPM's staff understood they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

73.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed there was a low risk that patients would become addicted to opioids.  The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue.  Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and was taken down from AAPM's website only after a doctor complained, though it still lingers on the internet elsewhere.

74.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend using opioids to treat chronic pain. Fourteen of the 21 panel members

---

[18] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain  Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), http://www.medscape.org/viewarticle/500829.

who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Endo, and Purdue.

75.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because he was concerned the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids.  The Guidelines have been cited 732 times in academic literature, were disseminated in and around Van Zandt County during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

**B.     Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.**

76.     To convince doctors treating residents in Van Zandt County and Van Zandt County patients that opioids can and should be used to treat chronic pain, Defendants had to convince them that long-term opioid use is both safe and effective.  Knowing they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Defendants made claims that were not supported by, or were contrary to, the scientific evidence. Even though pronouncements by and guidance from the FDA and the CDC based on that evidence confirm that their claims were false and deceptive, Defendants have not corrected them, or instructed their KOLs or Front Groups to correct them, and continue to spread them today.

C.      **Defendants Falsely Trivialized or Failed to Disclose the Known Risks of Long-Term Opioid Use.**

77.     To convince doctors and patients that opioids are safe, Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (1) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (2) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (3) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (4) abuse-deterrent opioids both prevent overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

78.     *First*, Defendants falsely claimed the risk of addiction is low and unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. For example:

    a.      Actavis's predecessor caused a patient education brochure to be distributed in 2007 claiming opioid addiction is possible, but "less likely if you have never had an addiction problem." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use this brochure in 2009 and beyond;

    b.      Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online;

    c.    Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them;"

    d.    Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website, www.opana.com;

    e.    Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain;"

    f.    Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated;"

    g.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online; and

    h.    Detailers for Purdue, Endo, and Janssen in and around Van Zandt County minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for opioid abuse with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

79.    These claims contradict longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])."[19] The guideline points out that "[o]pioid pain medication use presents serious risks, including…opioid use disorder" and that "continuing opioid therapy for

---

[19] *CDC Guideline for Prescribing Opioids for Chronic Pain – United States 2016*, Centers for Disease Control and Prevention (Mar. 18, 2016).

3 months substantially increases risk for opioid use disorder."[20]

80.     The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016.  In its announcements, the FDA discussed the risks related to opioid use and that IR opioids are associated with "persistent abuse, addiction, overdose mortality, and risk of NOWS [neonatal opioid withdrawal syndrome]."[21]

81.     According to the FDA, because of the risks associated with long-term opioid use, including "the serious risk of addiction, abuse, misuse, overdose, and death,"[22] opioids should be "reserved for pain severe enough to require opioid treatment and for which alternative treatment options (e.g., non-opioid analgesics or opioid combination products, as appropriate) are inadequate or not tolerated."[23]

82.     The warnings on Defendants' own FDA-approved drug labels caution that opioids "exposes users to risks of addiction, abuse and misuse, which can lead to overdose and death"[24] and that addiction "can occur in patients appropriately prescribed"[25] opioids.

83.     ***Second***, Defendants falsely instructed doctors and patients that signs of addiction are actually signs of undertreated pain and should be treated by prescribing more  opioids. Defendants called this phenomenon "pseudoaddiction" – a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL for Endo, Janssen, and Purdue – and claimed that pseudoaddiction is substantiated by scientific evidence.  For example:

---

[20] *Id.*
[21] *FDA Announcement of Enhanced Warnings for Immediate-Release Opioid Pain Medications Related to Risks of Misuse, Abuse, Addiction, Overdose and Death*, Federal Drug Administration (Mar. 22, 2016).
[22] *Id.*
[23] *Id.*
[24] *See, e.g.*, OxyContin label and insert at *OxyContin.com.*
[25] *Id.*



a.  Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. Responsible Opioid Prescribing remains for sale online. The 2012 edition continues to teach that pseudoaddiction is real;

b.  Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management;"

c.  Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials;

d.  Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated;" and

e.  Purdue sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

84.     The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment...are unlikely to experience pain relief with longer-term

use,"[26] and that physicians should "reassess[] pain and function within 1 month"[27] in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids"[28] because the patient is "not receiving a clear benefit."[29]

85.      *Third,* Defendants falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction.  These misrepresentations were especially insidious because Defendants aimed them at general  practitioners and family doctors who lack the time and expertise to closely manage higher-risk  patients. Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting opioid therapy for chronic pain. For example:

   a.   Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers' bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care:  Use of Opioids,* emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology  screens and pill counts;

   b.   Purdue sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk,* which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths;" and

   c.   As recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

86.      Once again, the 2016 CDC Guideline confirms these representations are false.  The Guideline notes that there are no studies assessing the effectiveness of  risk mitigation strategies –

---

[26] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[27] *Id.*
[28] *Id.*
[29] *Id.*



such as screening tools, patient contracts, urine drug testing, or pill counts – widely believed by doctors to detect and deter outcomes related to addiction and overdose.[30] As a result, the Guideline recognizes that doctors should not overestimate the risk screening tools for classifying patients as high or low risk for opioid addiction because they are insufficient to rule out the risks of long-term opioid therapy.[31]

87.      *Fourth*, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem thereby failing to disclose the increased difficulty of stopping opioids after long-term use.

88.      For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.  And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation."

89.      Defendants deceptively minimized the significant symptoms of opioid withdrawal, which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use.

90.      Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be limited to "minimize the need to taper opioids to prevent

---

[30] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[31] *See id.*

distressing or unpleasant withdrawal symptoms,"[32] because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days."[33]   The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence"[34] and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal"[35] and pausing and restarting tapers depending on the patient's response.

91.    The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."[36]

92.    *Fifth*, Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.  For example:

   a.    Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."  Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond;

   b.    Purdue sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed.  The guide stated that opioids have "no ceiling dose" and are therefore the most  appropriate

---

[32] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[33] *Id.*
[34] *Id.*
[35] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[36] *Id.*



treatment for severe pain.  This guide is still available for sale online;

c.    Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain;"

d.    Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on Endo's website.  In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?"  The response is, "The dose can be increased. . . . You won't 'run out' of pain relief;"

e.    Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force.  This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages;

f.    Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will;

g.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.  This publication is still available online;

h.    Purdue sponsored a CME entitled *Overview of Management Options* that is still available for CME credit.  The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages; and

i.    Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.

93.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC.  As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established"[37] while the "risks for serious harms related to opioid therapy increase at

---

[37] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*



higher opioid dosage."[38]

94.     More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[39]  Similarly, there is an "increased risk for opioid use disorder, respiratory depression, and death at higher dosages."[40]  That is why the CDC advises doctors to avoid increasing dosages above 90 morphine milligram equivalents per day.

95.     The 2016 CDC Guideline reinforces earlier findings announced by the FDA.  In 2013, the FDA acknowledged that available data suggested that increasing the opioid dosage likewise increased certain adverse events.  For example, the FDA noted that studies suggest a positive association between high-dose opioid use and overdoses.

96.     ***Finally***, Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can curb addiction and abuse.

97.     More specifically, Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter addiction and overdose.  For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant in a way that suggested it was more difficult to misuse the product. This claim was false.

98.     The FDA warned in a 2013 letter that there was no evidence Endo's design would provide a reduction in oral, intranasal or intravenous use.[41]  Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

---

[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *See FDA Statement: Original Opana ER Relisting Determination* (May 10, 2013).

PLAINTIFF'S ORIGINAL PETITION



99.    In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was designed to be or is crush resistant.  The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER.

100.    Similarly, the 2016 CDC Guideline states that no studies support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse,"[42] noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."[43]

101.    These numerous, long-standing misrepresentations of the risks of long-term opioid use spread by Defendants successfully convinced doctors and patients to discount those risks.

**D.    Defendants Grossly Overstated the Benefits of Chronic Opioid Therapy.**

102.    To convince doctors and patients that opioids should be used to treat chronic pain, Defendants had to persuade them that there was a significant benefit to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."[44]

103.    In fact, the CDC found no evidence showing "a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized  trials $\leq$ 6 weeks in duration)"[45] and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use.

104.    In 2013, the FDA stated that it was unaware of any studies demonstrating the

---

[42] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[43] *Id.*
[44] *Id.*
[45] *Id.*



safety and efficacy of opioids for long-term use.[46]  Despite this lack of studies, Defendants falsely

and misleadingly touted the benefits of long-term opioid use and suggested that these benefits

were supported by scientific evidence.  Not only have Defendants failed to correct these false and

deceptive claims, they continue to make them today.  For example:

a.   Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives;

b.   Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects;

c.   Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally."  The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs;

d.   Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them.  The ads implied that OxyContin improves patients' function;

e.   *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online;

f.   Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."  The guide was available online until APF shut its doors in 2012;

g.   Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."  Elsewhere, the website touted improved quality of life (as well as "improved function") as

---

[46] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Eval. & Res., to Andrew Kolodny, M.D., Pres. Physicians for Responsible Opioid Prescribing, Re Docket No. FDA-2012-P-0818 (Sept. 10, 2013).

benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site;

h.  Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast;

i.  Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube;

j.  Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today; and

k.  Purdue's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

105.  These claims find no support in the scientific literature. Most recently, the 2016 CDC Guideline, approved by the FDA, concluded, "There is <u>no good evidence</u> that opioids improve pain or function with long-term use"[47] and "complete relief of pain is unlikely."[48] (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

a.  "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."[49]

b.  "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy;"[50] and

c.  "[E]vidence is limited or insufficient for improved pain or function with

---

[47]*CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[48] *Id.*
[49] *Id.*
[50] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*



long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."[51]

106.   The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations."[52] As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

107.   The 2016 CDC Guideline was not the first time a federal agency repudiated Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience…results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[53]

108.   Defendants also falsely emphasized or exaggerated the risks of competing products like NSAIDs so that doctors and patients would look to opioids first for treating chronic pain. Once again, Defendants' misrepresentations contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence.

109.   Consequently, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should be used only as a last resort where alternative treatments like non-opioid drugs are inadequate. And the 2016 CDC Guideline states that NSAIDs,

---

[51] *Id.*

[52] *Id.*

[53] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm259240.htm.

not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

110.    In addition, Purdue misleadingly promoted OxyContin as unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action.

111.    According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. The reason is that OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. Although the patient experiences a powerful initial response, there is little or no pain relief at the end of the dosing period because less medicine is released.

112.    This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a substantial number of chronic pain patients taking OxyContin experience it.

113.    This "end of dose" failure not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

114.    Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives continue to tell doctors in and around Van Zandt County that OxyContin lasts a full 12 hours.



**E.      Defendants also engaged in Other Unlawful, Unfair, and Fraudulent Misconduct.**

115.    Defendants herein participated in illicit and unlawful prescribing of its drugs.  For example, Purdue did not report illegal prescribing of OxyContin until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets. In doing so, Purdue protected its own profits at the expense of public health and safety.

116.     The State of New York found that Endo failed to require sales representatives to report signs of addiction, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

**F.      Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.**

117.     As a part of their deceptive marketing scheme, Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S. and in and around Van Zandt County. For example, Defendants focused their deceptive marketing on primary care doctors, who were  more likely to treat chronic pain patients and prescribe opioids, but were less likely to be educated about treating pain and the risks and benefits of opioids.

118.    Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain.  Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them.

119.    For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions.  The Guideline therefore concludes that  there are "special risks of long-term opioid use for elderly patients" and



recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.

120.   The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

**G.   Although Defendants knew that their Marketing of Opioids was False and Deceptive, they Fraudulently Concealed their Misconduct.**

121.   Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes.

122.   Not only did the FDA and other regulators warn Defendants, but Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use, including the suffering from addiction, overdoses, and death in alarming numbers in patients using opioids.

123.   More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements prohibiting them from making some of the same misrepresentations described herein in New York.

124.   Specifically, three current and former executives from Purdue plead guilty in 2007 to criminal charges that they misled regulators, doctors, and patients about OxyContin's risk of



addiction.[54] In pleading guilty to misbranding charges, Purdue admitted it had fraudulently marketed OxyContin as a drug less prone to addiction and as having fewer side effects than other opioids.[55] In reality, unlike other opioids, OxyContin contained pure oxycodone without any other ingredients, which made it a powerful narcotic despite its time-release design that Purdue touted as ameliorating its addictive potential.[56]

125.    Moreover, Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct.  For example, Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs.

126.    Finally, Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not.

127.    Thus, Defendants successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims Van Zandt County now asserts. Van Zandt County did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**H.     By Increasing Opioid Prescriptions and Use, Defendants' Deceptive Marketing Scheme has fueled the Opioid Epidemic and Devastated Van Zandt County Communities.**

128.    Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use.  Studies reveal that many doctors and patients are unaware of or do not understand the risks or benefits of opioids.  Indeed, patients often report that they were not

---

[54] *See* Barry Meier, "In Guilty Plea, OxyContin Maker to Pay $600 Million," (May 10, 2007), http://www.nytimes.com/2007/05/10/business/11drug-web.html.
[55] *See id.*
[56] *See id.*


CERTIFIED COPY

warned they might become addicted to opioids prescribed to them.  As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.[57]

129.    Defendants' deceptive marketing scheme caused and continues to cause doctors in and around Van Zandt County to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent Defendants' deceptive marketing scheme, these doctors would not have been able to over prescribe opioids or become embroiled in pill mills that negatively impacted residents of Van Zandt County.

130.    While Defendants may claim the federal government authorized the amount of annual prescription opioids sold, they know in truth that several Defendants have successfully used their organized money and influence to render the federal government's enforcement agency, the Drug Enforcement Administration, virtually powerless to interrupt the over-supply of prescription opioid drugs.

131.    Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

132.    Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode.  Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91  million in 2000.

---

[57] Hazelden Betty Ford Foundation, *Missed Questions, Missed Opportunities* (Jan. 27, 2016), *available at* http://www.hazeldenbettyford.org/about-us/news-and-media/pressrelease/doctors-missing-questions-that-could-prevent-opioid-addiction.

By 2011, that spending had tripled to $288 million.

133.    The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Van Zandt County.

134.    Scientific evidence demonstrates a strong correlation between opioid prescriptions and becoming addicted to opioids.  In a 2016 report, the CDC explained that prescribing opioids has quadrupled since 1999, which has resulted in a parallel increase in opioid overdoses.[58]  Indeed, there has been a two-third increase in overdose deaths from using opioids since 2000.[59]  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the cycle of opioid pain medication misuse that contributes to the opioid overdose epidemic."[60]

135.    Due to the increase in opioid overdoses, first responders such as police officers, have been and will continue to be in the position to assist people experiencing opioid-related overdoses.[61]  In 2016, "over 1,200 law enforcement departments nationwide carried naloxone in an effort to prevent opioid-related deaths."[62]

136.    Defendants' deceptive marketing scheme has also detrimentally impacted children in Van Zandt County. Overprescribing opioids for chronic pain has made the drugs more accessible

---

[58] CDC. National Vital Statistics System, Mortality. CDC WONDER. Atlanta, GA: US Department of Health and Human Services, CDC; 2016. https://wonder.cdc.gov/;  Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. MMWR Morb Mortal Wkly Rep. ePub: 16 December 2016.

[59] *National Vital Statistics System*, Mortality file and appearing *Center for Disease Control and Prevention* Morbidity and Mortality Weekly Report, January 1, 2006 / 64(50); 1378-82, Increases in Drug and Opioid Deaths – United States, 2000-2014.

[60] *CDC Guideline for Prescribing Opioids for Chronic Pain, supra; see also* Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. MMWR Morb Mortal Wkly Rep. ePub: 16 December 2016.

[61] Opinion of the Attorney General of Texas, KP-0168 (Oct. 4, 2017).

[62] *Id. citing* http://www.nchrc.org/law-enforcement/us-law-enforcement-who-carry-naloxone/.

to school-aged children, who come into contact with opioids after they have been prescribed to friends or relatives in the same household.

137.    Defendants' conduct has adversely affected Van Zandt County's child protection agencies in the number of children in foster care driven by parental drug addiction. Children with parents addicted to drugs tend to stay in foster care longer, and they often enter the system having experienced significant trauma, which makes these cases more expensive for counties like Van Zandt County.

138.    Opioid addiction is one of the primary reasons that Van Zandt County residents seek treatment for substance dependence. A significant number of admissions for drug addiction were associated with a primary diagnosis of opiate addiction or dependence.

139.    Defendants' creation, through false and deceptive advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed Van Zandt County communities. Defendants' success in extending the market for opioids to new patients and chronic pain conditions has created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that 60% of the opioids to which people are addicted come, directly or indirectly, through doctors' prescriptions.[63]

140.    Law enforcement agencies have increasingly associated prescription drug addiction with violent and property crimes. Despite strict federal regulation of prescription drugs, local law enforcement agencies are faced with increasing diversion from legitimate sources for illicit purposes, including doctor shopping, forged prescriptions, falsified pharmacy records, and employees who steal from their place of employment. The opioid epidemic has prompted a

---

[63] Nathaniel P. Katz, *Prescription Opioid Abuse: Challenges and Opportunities for Payers*, Am. J. Managed Care (Apr. 19 2013), at 5 ("The most common source of abused [opioids] is, directly or indirectly, by prescription."), http://www.ajmc.com/publications/issue/2013/2013-1-vol19-n4/Prescription-Opioid-Abuse-Challenges-and-Opportunities-for-Payers.

growing trend of crimes against pharmacies including robbery and burglary.  This ongoing diversion of prescription narcotics creates a lucrative marketplace.

141.    The rise in opioid addiction caused by Defendants' deceptive marketing scheme has also resulted in an explosion in heroin use. For example, heroin use has more than doubled in the past decade among adults aged 18 to 25 years.[64] Moreover, heroin-related overdoses in the United States has more than quadrupled since 2010.[65]

142.    The costs and consequences of opioid addiction are staggering.  For example, in 2007, the cost of healthcare due to opioid addiction and dependence was estimated at 25 billion, the cost of criminal justice was estimated at 5.1 billion, and the cost of lost workplace productivity was estimated at 25.6 billion.

143.    Consequently, prescription opioid addiction and overdose have an enormous impact on the health and safety of individuals, as well as communities at large, because the consequences of this epidemic reach far beyond the addicted individual.

144.    Some of the repercussions for residents of Van Zandt County include job loss, loss of custody of children, physical and mental health problems, homelessness and incarceration, which results in instability in communities often already in economic crisis and contributes to increased demand on community services such as hospitals, courts, child services, treatment centers, and law enforcement.

145.    Defendants knew and should have known about these harms that their deceptive marketing has caused and continues to cause and will cause in the future. Defendants closely monitored their sales and the habits of prescribing doctors.  Their sales representatives, who visited

---

[64] Centers for Disease Control and Prevention.  Vital Signs:  Today's Heroin Epidemic – More People at Risk, Multiple Drugs Abused. (https://www.cdc.gov/vitalsigns/heroin/index.html).  MMWR 2015.
[65] https://www.cdc.gov/vitalsigns/heroin/index.html



doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding.

146.    Defendants also had access to and carefully watched government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. Defendants not only knew, but intended that their misrepresentations would persuade doctors to prescribe and encourage patients to use their opioids for chronic pain.

147.    Defendants' actions are neither permitted nor excused by the fact that their drug labels may have allowed, or did not exclude, the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by, and guidance from, the FDA based on the medical evidence and their own labels.

148.    Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants also hijacked what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

149.    Defendants' actions and omissions were each a cause-in-fact of Van Zandt County's past and future damages. Defendants' wrongful conduct caused injuries to Van Zandt County in the past, continues to cause injuries to Van Zandt County, and will continue to cause injuries to Van Zandt County in the future. Future damages include, but are not limited to, additional resources for counseling and medication assisted treatment of addicts, medical treatment for overdoses, life skills training for adolescents, increased law enforcement, and additional


CERTIFIED COPY

resources to treat the psychological effects of opioids and the underlying conditions that make people susceptible to opioid addiction.

**I.      Defendants' Fraudulent Marketing Has Led To Record Profits.**

150.    While using opioids has taken an enormous toll on Van Zandt County and its residents, Defendants have realized blockbuster profits.  In 2014 alone, opioids generated $11 billion in revenue for drug companies like Defendants. Indeed, financial information indicates that each Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described above.

**VI.      FIRST CAUSE OF ACTION:  PUBLIC NUISANCE**
**AGAINST ALL DEFENDANTS**

151.    Van Zandt County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

152.    Defendants knowingly encouraged doctors in and around Van Zandt County to prescribe, and residents to use, highly addictive opioids for chronic pain even though Defendants knew using opioids had a high risk of addiction and reduced quality of life.

153.    By doing so, Defendants purposefully interfered with Van Zandt County's public health, public safety, public peace, public comfort, and public convenience.

154.    Defendants, individually and in concert with each other, have contributed to and/or assisted in creating and maintaining a condition that is harmful to the health and safety of Van Zandt County residents and/or unreasonably interferes with the peace and comfortable enjoyment of life in violation of Texas law.

155.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community – and the harm inflicted outweighs any offsetting benefit.

156.   The staggering rates of opioid use resulting  from Defendants' marketing efforts have caused, and continues to cause, harm to the community including, but not limited to:

a.   Upwards of 30% of all adults use opioids. These high rates of use have led to  unnecessary opioid addiction, overdose, injuries, and deaths;

b.   Children have been exposed to opioids prescribed to family members or others resulting in injury, addiction, and death.  Easy access to prescription opioids has made  opioids a recreational drug of choice among Van Zandt County teenagers;  opioid use  among teenagers is only outpaced by marijuana use.  Even infants have  been born addicted to opioids due to prenatal exposure causing severe  withdrawal symptoms and lasting developmental impacts;

c.   Residents of Van Zandt County, who have never taken opioids, have endured both the emotional and  financial costs of caring for loved ones addicted to or injured by opioids and the loss of companionship, wages, or other support from family  members who have used, become addicted to, overdosed on, or been killed by opioids;

d.   More broadly, opioid use and addiction have driven Van Zandt County residents' health care costs higher;

e.   Employers have lost the value of productive and healthy employees who have  suffered from adverse consequences from opioid use;

f.   Defendants' success in extending the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a new wave of addiction and injury.  Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them;

g.   This demand has created additional illicit markets in other opiates, particularly heroin.  The low cost of heroin has led some of those who initially become addicted to prescription opioids to migrate to cheaper heroin, fueling a new heroin epidemic in the process;

h.   Diverting opioids into secondary, criminal markets and increasing the number of  individuals who are addicted to opioids has increased the demands on emergency services and law enforcement in Van Zandt County;

i.   All of Defendants' actions have caused significant harm to the community – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken families and homes;

CERTIFIED COPY

j.   These harms have taxed the human, medical, public health, law enforcement, and financial resources of Van Zandt County; and

k.   Defendants' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is limited social utility to opioid use and any potential value is outweighed by the gravity of harm inflicted by Defendants' actions.

157.   Defendants knew, or should have known, that promoting opioid use would create a public nuisance in the following ways:

a.   Defendants have engaged in massive production, promotion, and distribution of opioids for use by the citizens of Van Zandt County;

b.   Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management;

c.   Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

d.   Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences that the larger community would suffer as a result.

158.   Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain thereby causing opioids to become widely available and used in Van Zandt County.

159.   Without Defendants' actions, opioid use would not have become so widespread and the enormous public health hazard of opioid addiction would not have existed and could have been averted.

160.   The health and safety of the citizens of Van Zandt County, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to Van Zandt County's citizens and residents.

161.   The public nuisance created, perpetuated, and maintained by Defendants can be



abated and further reoccurrence of such harm and inconvenience can be prevented.

162.    Defendants' conduct has affected and continues to affect a considerable number of people within Van Zandt County and is likely to continue to cause significant harm to patients who take opioids, their families, and the community at large.

163.    Each Defendant created or assisted in creating the opioid epidemic, and each Defendant is jointly and severally liable for its abatement. Furthermore, each Defendant should be enjoined from continuing to create, perpetuate, or maintain said public nuisance in Van Zandt County.

## VII.   SECOND CAUSE OF ACTION: COMMON LAW FRAUD
### AGAINST ALL DEFENDANTS

164.    Van Zandt County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

165.    At all relevant and material times, Defendants expressly and/or impliedly warranted that opioids were safe, of merchantable quality, and fit for use.

166.    Defendants' superior knowledge and expertise, its relationship of trust and confidence with doctors and the public, its specific knowledge regarding the risks and dangers of opioids, and its intentional dissemination of promotional and marketing information about opioids for the purpose of maximizing sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about the risks and harms associated with opioids.

167.    At all times herein mentioned, Defendants, individually and acting through their employees and agents, and in concert with each other, fraudulently represented to physicians who Defendants knew would justifiably rely on Defendants' representations that opioids were safe and effective for treating chronic pain.

168.    Defendants' false representations were fraudulently made, with the intent or

purpose that healthcare providers and patients would justifiably rely upon them, leading to the

prescription, administration, filling, purchasing, and consumption of opioids in Van Zandt County.

169.   Defendants' deliberate misrepresentations and/or concealment, suppression, and

omission of material facts as alleged herein include, but are not limited to:

a.   Making false and misleading claims regarding the known risks of the addictive nature of opioids and suppressing, failing to disclose, and mischaracterizing the addictive nature of opioids and in concomitant costs, such as overdoses, deaths, and heroin addiction;

b.   Making false and misleading written and oral statements that opioids are more effective than traditional pain killers for chronic pain, or effective at all and/or omitting material information showing that opioids are no more effective than other non-addictive drugs for chronic pain;

c.   Issuing false and misleading warnings and/or failing to issue adequate warnings concerning the risks and dangers of using opioids;

d.   Making false and misleading claims downplaying the risk of addiction when using opioids and/or setting forth guidelines that would purportedly identify addictive behavior; and

e.   Making false and misleading misrepresentations concerning the safety, efficacy and benefits of opioids without full and adequate disclosure of the underlying facts which rendered such statements false and misleading.

170.   Defendants willfully, wantonly, and recklessly disregarded their duty to provide

truthful representations regarding the safety and risk of opioids.

171.   Defendants made these misrepresentations with the intent that the healthcare

community and patients located wherever these opioid drugs were sold or consumed would rely

upon them.

172.   Defendants' misrepresentations were made with the intent of defrauding and

deceiving the medical community and consumers to induce and encourage the sale of opioids.

173.   Defendants' fraudulent representations evidence their callous, reckless, willful, and

depraved indifference to the health, safety, and welfare of consumers living in Van Zandt County.

174.   Defendants omitted, misrepresented, suppressed and concealed material facts

CERTIFIED COPY

concerning the dangers and risk of injuries associated with the use of opioids, as well as the fact that the product was unreasonably dangerous.

175.    Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of opioids.

176.    The treating medical community and consumers in Van Zandt County did not know that Defendants' representations were false and/or misleading and justifiably relied on them.

177.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of opioids, which they intentionally concealed.

178.    As a direct and proximate result of Defendants' fraudulent misrepresentations and intentional concealment of facts, upon which the medical community and consumers in Van Zandt County reasonably relied, Van Zandt County suffered actual and punitive damages.

## VIII.    THIRD CAUSE OF ACTION: NEGLIGENCE
### AGAINST MANUFACTURING AND DISTRIBUTING DEFENDANTS

179.    Van Zandt County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

180.    Manufacturing Defendants have a duty to exercise reasonable care in marketing its opioids to physicians treating residents of Van Zandt County and Van Zandt County residents. Manufacturing Defendants have breached their duty by knowingly and fraudulently misrepresenting the benefits of, and downplaying the risks of, opioids for chronic pain.

181.    Manufacturing Defendants have used deceitful marketing ploys, KOLs, Front Groups, and other schemes to increase profits at the cost of public health causing an opioid epidemic. Manufacturing Defendants have acted willfully, wantonly, and maliciously.

182.    Likewise, Distributor Defendants have a duty to exercise ordinary care in distributing opioids. Distributor Defendants have breached their duty by failing to prevent or reduce the distribution of opioids, or to report the increase in the distribution and/or sale of opioids.



183.   Distributor Defendants have intentionally failed to prevent or reduce the distribution of opioids, or to report any increases in the sale of opioids, so that they could increase profits and receive rebates or kick-backs from Manufacturing Defendants.  Distributor Defendants have acted willfully, wantonly, and maliciously.

184.   As a proximate result, Manufacturing and Distributor Defendants and its agents have caused Van Zandt County to incur excessive costs to treat the opioid epidemic in its county, including but not limited to increased costs of social services, health systems, law enforcement, judicial system, and treatment facilities.

185.   Van Zandt County and its residents are therefore entitled to actual and punitive damages.

## IX.    FOURTH CAUSE OF ACTION: GROSS NEGLIGENCE
### AGAINST MANUFACTURING AND DISTRIBUTING DEFENDANTS

186.   Van Zandt County incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

187.   Defendants' marketing scheme to optimize profits by misrepresenting and falsely touting opioids as the panacea to chronic pain was done intentionally.

188.   Defendants' hiring of KOLs, Front Groups, and others to spread its fraudulent message that opioids were useful and beneficial for chronic pain was grossly negligent and done with conscious indifference or reckless disregard for the safety of others.

189.   Each Defendant's actions and omissions as described herein, singularly or in combination with each other, was malicious resulting in damages and injuries to Van Zandt County and its residents.

190.   At every stage, Defendants knew or should have known that their conduct would create an unreasonable risk of physical harm to others, including Van Zandt County and its residents,



and should be held liable in punitive and exemplary damages to Van Zandt County.

## X.    FIFTH CAUSE OF ACTION:
### TEXAS CONTROLLED SUBSTANCES ACT ("TCSA")
### AGAINST DISTRIBUTOR DEFENDANTS

191.    Van Zandt County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

192.    Distributor Defendants have knowingly distributed, delivered, administered, or dispensed a controlled substance in violation of the Texas Controlled Substances Act §481.128(a)(1) by deceiving practitioners into prescribing, dispensing, delivering, or administering a controlled substance, or causing a controlled substance to be administered when there is no valid medical purpose. Tex. Health & Safety Code §481.071.

193.    As alleged herein, each Distributor Defendant, at all times relevant to this Complaint, violated the Texas Controlled Substance Act by making deceptive representations about using opioids to treat chronic pain.  Each Distributor Defendant also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids.  Each Distributor Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

194.    Distributor Defendants' deceptive representations and concealments were reasonably calculated to deceive practitioners treating Van Zandt County residents into prescribing opioids without any valid medical purpose, and Distributor Defendants continue to do so to this day.

195.    As a direct and proximate cause of Distributor Defendants' conduct, Van Zandt County should be awarded civil penalties pursuant to the Texas Controlled Substances Act.



## XI.   SIXTH CAUSE OF ACTION: UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

196.   Van Zandt County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

197.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid purchases made by Van Zandt County and its residents.

198.   When Van Zandt County and its residents purchased opioids, they expected that Defendants had provided necessary and accurate information regarding those risks. Instead, Defendants had misrepresented the material facts regarding the risks and benefits of opioids.

199.   Defendants have been unjustly enriched at the expense of Van Zandt County, and Van Zandt County is therefore entitled to damages to be determined by the jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

a.   That the acts alleged herein be adjudged and decreed to be unlawful and that the Court enter a judgment declaring them to be so;

b.   That Defendants be enjoined from, directly or indirectly through KOLs, Front Groups or other third parties, continuing to misrepresent the risks and benefits of the use of opioids for chronic pain, and from continuing to violate Texas law;

c.   That Plaintiff recover all measures of damages, including punitive and exemplary damages, allowable under the law, and that judgment be entered against Defendants in favor of Plaintiff;

d.   That Plaintiff recover restitution on behalf of Van Zandt County consumers who paid for opioids for chronic pain;

e.   That Plaintiff recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorneys' fees as provided by law; and

f.   That Defendants be ordered to abate the public nuisance that they created in

PLAINTIFF'S ORIGINAL PETITION

in violation of Texas common law.

Date:  December 29, 2017

Respectfully Submitted,

**Van Zandt County District Attorney's Office**

*/s/Christopher Martin*
Christopher Martin
TX State Bar No. 24050016
400 South Buffalo
Canton, TX 75103
Tel: 903-567-4104
Fax: 903-567-6258
chrismartin@vanzandtcounty.org

**OF COUNSEL:**

**SIMON GREENSTONE PANATIER BARTLETT, P.C.**

*/s/Jeffrey B. Simon*
Jeffrey B. Simon
TX State Bar No. 00788420
Amy M. Carter
TX State Bar No. 24004580
3232 McKinney Avenue, Suite 610
Dallas, Texas 75204
Tel: 214-276-7680
Fax: 214-276-7699
jsimon@sgpblaw.com
acarter@sgpblaw.com

**MARTIN WALKER, P.C.**
Jack Walker
TX State Bar No. 00785167
Reid Martin
TX State Bar No. 13098986
121 N. Spring Avenue
Tyler, Texas 75702
Tel: 903-526-1600
Fax: 903-595-0796
rmartin@martinwalkerlaw.com
jwalker@martinwalkerlaw.com

PLAINTIFF'S ORIGINAL PETITION



I certify this to be a true and exact copy of the original on file in the District Clerk's Office Van Zandt County, Texas
By _____ DEPUTY CLERK
55